UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>ex rel. KEITH FERNANDEZ )<br>        Plaintiffs, )<br>   v. )<br>         )<br>FREEDOM HEALTH, INC., )<br>OPTIMUM HEALTHCARE, INC., )<br>and PHYSICIAN PARTNERS, LLC., )<br>        Defendants. ) | **FILED UNDER SEAL**<br>JURY TRIAL DEMANDED<br><br>8:18-CV-01959-T-35-JSS |

## COMPLAINT

1. This is an action to recover damages and civil penalties on behalf of the United States of America under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq.

2. This action arises from false statements, false records, and false claims submitted to the United States by Defendants to get these false claims paid.

3. Relator Keith Fernandez ("Relator") alleges that Defendants have violated the FCA by systematically submitting false risk adjustment data to Medicare in order to receive enhanced payment from the government.

### I.    Parties

4. **Relator Keith Fernandez** is a resident of the State of New York. In 2015 he was the CEO of National Diagnostic Systems ("NDS" or "Diagnostic Systems"), a radiology physician service business. NDS is now dissolved. Relator is currently an MBA candidate at The Wharton School at the University of Pennsylvania.



5. **Defendants Freedom Health, Inc., and Optimum Healthcare, Inc.**, both Medicare Advantage insurance programs, are Florida corporations with a principal places of business in Tampa, Florida.

6. Freedom and Optimum previously settled a case alleging similar violations and entered into a Corporate Integrity Agreement with the United States Department of Health and Human Services. *United States ex rel. Sewell v Freedom Health, Inc. Optimum Healthcare, Inc., et al.*, 8:09-cv-1625-T-35TGW (M.D. Fla).[1]

7. **Defendant Physician Partners LLC** ("Physician Partners"), located in Tampa, Florida, is a Management Service Organization serving approximately 22,000 Medicare Advantage patients.

8. Physician Partners, Freedom Health ("Freedom"), and Optimum Healthcare ("Optimum") are affiliated companies and have overlapping ownership.

## II. Jurisdiction and Venue

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

10. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §1391(b) and (c), in that all defendants can be found in, reside in, and transact business in the Middle District of Florida.

---

[1] https://www.justice.gov/opa/pr/medicare-advantage-organization-and-former-chief-operating-officer-pay-325-million-settle.

11. Relator is an original source of the allegation contained herein, and has voluntarily disclosed such to the United States Attorney's Office for the Middle District of Florida before filing his complaint.

### III. The Law

12. **The False Claims Act** provides in pertinent part that any person who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G), is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(l) *et seq*.

13. **The Medicare program** was enacted under Title XVIII of the Social Security Act in 1965, to pay for certain healthcare services based primarily on age. The Department of Health and Human Services ("HHS") administers the Medicare Program, as promulgated by 42 U.S.C.§§ 1395 *et seq*. The Center for Medicare and Medicaid Services ("CMS") is the agency of HHS directly responsible for the administration of the Medicare Program. The Medicare program provides for the payment of claims submitted to it by healthcare providers for services rendered to its beneficiaries.

14. **Medicare Advantage programs** are an alternative to the traditional fee-for-service program. In the Medicare Advantage program private insurers agree to pay all the medical claims for a pool of beneficiaries in exchange for a monthly capitation payment

per enrollee. This capitation payment is adjustable based upon the severity of illness of the patient, known as the risk score.

15. Certain diagnosed illnesses are entitled to enhanced reimbursement, which must be based upon face-to-face encounters with providers. In seeking enhanced capitation payments, insurers must provide accurate and sufficient evidence, known as risk adjustment data.

16. Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. See, e.g., *2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*. First, CMS requires that the patient must have been treated for the relevant diagnoses during a face-to-face encounter with a physician or a hospital during the year in question. The treating provider must document the facts supporting the diagnosis code in the medical records and sign and date the record. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based upon any diagnostic radiology service" *Participant Guide* at 4-3.

### IV. Defendants' Misconduct

17. Defendants have defrauded CMS by knowingly submitting incorrect and/or unsubstantiated risk adjustment data to CMS. Under the MA payment system, CMS adjusts the monthly capitation rate it pays MA plans for each member to account for the member's health risk. CMS pays MA plans more if the plans' members have certain diseases or illnesses that routinely require more expensive care. CMS makes these enhanced payments

4

in reliance on data-known as "Risk Adjustment" data-submitted by the plans about the health status of their members.

18. In September 2015, National Diagnostic Systems ("NDS") contracted with Physician Partners, a Management Service Organization serving 22,000 Medicare Advantage patients, to provide ultrasound screening exams to its Medicare Advantage patients within Physician Partners's network of primary care physicians ("PCPs") in Florida.

19. Physician Partners first solicited NDS on May 5, 2015 by email. After preliminary talks, Physician Partners hired NDS to perform ultrasound screening exams of the lower arteries of the legs and echocardiograms for Physician Partners' patients. Physician Partners agreed to pay NDS a flat fee of $70 for each screening exam furnished. Physician Partners executives told Relator, who was then CEO of NDS, that these tests were limited screening exams only, and that the program did not directly generate revenue for their companies. Over the course of the next 2 months, NDS and its physicians performed 1,748 screening exams for Physician Partners' patients.

20. Relator soon observed that Physician Partners was routinely *forging* primary care physician prescriptions for leg and cardiac scans. The scripts for these tests were not generated by the patient's physician. Instead, Physician Partners was using its own stationery envelopes, mass mailed instructions (purporting to be from the patients' primary care doctors) to Physician Partners patients imploring them to call a toll-free phone number and schedule leg ultrasounds and echocardiograms. Of note is the harsh and deceptive language used in the letters:

5

**IMPORTANT LETTER / ORDER FROM YOUR DOCTOR / OPEN IMMEDIATELY**
**NO CHARGE TO YOU!**
**VERY IMPORTANT / ABOUT YOUR GOOD HEALTH / AN OUNCE OF PREVENTION IS WORTH A POUND OF CURE**
**IN REVIEWING YOUR MEDICAL HISTORY, I HAVE IDENTIFIED THE DIAGNOSTIC TESTS TO BE PERFORMED**

21. The phone number reached a Physician Partners call center, not a doctor's office, where operators were instructed via a written script to tell patients that they could not refuse the tests, and that their health was at risk even though this was not the case. The doctors' electronic signatures' were copied and pasted on the prescriptions.

22. There was no medical necessity for any of these tests. These tests were actually "ordered" by defendants, not by the primary care physicians. There was no face-to-face examination by the physicians. In addition, echocardiograms are never in ordered by primary care physicians and even cardiologists will only order such based upon a precipitating examination and medical necessity. Defendants "ordered" these tests only to increase the risk score for their Medicare Advantage members in order to received enhanced payments from Medicare.

23. Some Physician Partners primary care physicians became so suspicious of the testing program, with an insurance company ordering indiscriminate testing on their patients, that they instructed Physician Partners to cancel all of the screening tests. An example is Dr. Roque who protested, resulting in Physician Partners canceling all screening test patient appointments for him.

24. Relator also observed that Physician Partners demanded that NDS and its physicians use suggested diagnosis (ICD) codes that defendants referred to in phone calls to NDS as "weighted codes." NDS was given a list of such diagnosis codes relating to many serious diagnoses, which NDS radiologists were constantly badgered into using in their reports. The sole purpose of such a scheme was to increase risk score and reimbursement for defendants.

25. CMS regulations expressly prohibit Medicare Advantage plans from "submitting risk adjustment diagnoses based upon any diagnostic radiology services." See *2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide*, at 4-3. This is because radiology alone, only suggests a possible diagnosis, which must be viewed in conjunction with a face-to-face examination, and review of the patient's medical record. Yet this is precisely what defendants did, submitting diagnoses based solely upon radiological screening tests.

26. Physician Partners executives went so far as asking NDS physicians to go back and amend final test reports to include certain ICD codes. Physician Partners even asked NDS to find and pay other doctors who would play ball. Despite this, NDS refused these requests and often got into heated arguments with Physician Partners management over their attempt to pressure them. After the first week of the testing program, Physician Partners COO Kollefrath refused to accept NDS test reports until certain "data needs" were fulfilled, a euphemism for false coding.

27. On November 2, 2015, Physician Partners's chief of staff sent an email to Relator requesting NDS doctors' NPI numbers, facility license numbers and state license

7

numbers) apparently to facilitate billing to the Medicare Part C program through their affiliated HMO Entities, Freedom and Optimum.

28. During a weekly conference call on November 4, 2015 between PP Executives and NDS, Kollefrath admitted to Relator that Physician Partners planned on having its affiliate HMO's Freedom and Optimum submit NDS encounter data to the Medicare Part C Program for reimbursement. Relator earlier had been told by Physician Partners that its diagnostic exams would not be reported to Medicare for reimbursement purposes. That same day Physician Partners sent an email to NDS and Physician Partners staff summarizing the key items from this conference call. This email suggests that Physician Partners and affiliate Freedom/Optimum intended to submit encounter data directly to the Medicare Part C program.

29. Relator also found it highly suspicious that Physician Partners began making payments to NDS from Physician Partners CEO Sidd Pagidipati's personal American Express credit card. Physician Partners would often brag to Relator that Sidd was very wealthy and had a million dollar limit on his card and they insisted on making payments this way.

30. On November 6 and 19, 2015 Relator sent emails to Physician Partners executives alerting them that they did not approve of the submission of NDS encounter data by Freedom/Optimum to Medicare due to concerns regarding compliance with Federal Laws.

31. In response to this email, Physician Partners's Kollefrath immediately sent an email to NDS stating that they would not submit the encounter/claims data until both parties

agreed explicitly on how to do so, a tacit admission of intent to do just so. With Physician Partners refusing to drop its demands for false additional diagnosis codes, among other things mentioned, NDS severed its relationship with Physician Partners in Novermber, 2015.

32. NDS was not the only company that did screening tests for Physician Partners. In a telephone conversation between Relator and Kollefrath on May 5, 2015, Kollefrath told Relator that Physician Partners had another diagnostic testing company, HealthFair, administer ultrasounds on HealthFair's mobile buses to over 12,000 patients within Physician Partners's network, starting in June of 2014. Kollerfrath stated that this screening program on the mobile buses, referred to it as "STEP 1", was a great success. He then told Relator that Physician Partners had requested that HealthFair perform another round of the screening program directly within the offices of Physician Partners's Primary Care Physicians, due to "compliance reasons." He called this next "in-office" program with HealthFair, "STEP 2". Kollerfrath stated that HealthFair struggled with "STEP 2" and that Physician Partners and its CEO, Sidd Pagidipati, wanted to hire another vendor for "STEP 3", hence the contract with NDS.

## DAMAGES

33. Defendants have received millions of dollars of improper risk adjustment payments from Medicare. Medicare pays an increased capitation payment each month for patients with certain diagnoses. Defendants have received risk adjustment payments for thousands of patients, by submitting false diagnoses to Medicare.

## V. Counts

### A. Presenting or Causing False or Fraudulent Claims, § 3729(a)(1)(A)

Relator repeats and realleges the preceding paragraphs as if fully set forth herein.

34. All Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

35. All defendants also made or caused claims which include materially misleading omissions in violation.

As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### B. All Defendants' False Records or Statements, § 3729(a)(1)(B)

Relator repeats and realleges the preceding paragraphs as if fully set forth herein.

36. All Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

37. The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

38. The United States, unaware of the falsity of the claims and/or statements

made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing claims for services to patients enrolled in Federal Programs where said services are unnecessary, unreasonable and/or not provided.

As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### C. Defendants Freedom and Optimum Avoided an Obligation to Refund, 31 U.S.C. § 3729(a)(1)(G)

Relator repeats and realleges the preceding paragraphs as if fully set forth herein and further alleges.

39. Freedom and Optimum entered into a Corporate Integrity Agreement with the United States Department of Health and Human Services. *United States ex rel. Sewell v Freedom Health, Inc. Optimum Healthcare, Inc., et al.* docket 8:09-cv-1625-T-35TGW (M.D. Fla). [2]

40. The Corporate Integrity Agreement specifically required defendants Freedom and Optimum "to identify and adjust any past charges or claims for unallowable costs."

41. On information and belief, neither Freedom nor Optimum have identified nor adjusted the claims Relator asserts in his instant complaint, relating to the screening exams NDS or HealthFair did for defendants.

42. Defendants Freedom and Optimum made reverse false claims in violation of § 3729(a)(1)(G)) by falsely certifying compliance with its CIA's reporting requirements in

---

[2] https://oig.hhs.gov/fraud/cia/agreements/Freedom_Health_Inc_and_Optimum_Healthcare_Inc_05112017.pdf

order to avoid their obligation to pay stipulated penalties under the CIA. 31 U.S.C. § 3729(a)(1)(G).

43. The claims submitted by Defendant Optimum are also false because it was in material breach of the CIA's compliance and reporting obligations at the time it submitted those claims.

44. The Defendant Optimum knowingly made, used or caused to be made or used false records or false statements – i.e., the false certifications made or caused to be made by it – material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

The false statements or records misleadingly omit critical facts which constitute material misrepresentations.

## VI. Prayer for Relief

WHEREFORE, *Qui Tam* Plaintiff Fernandez, for the United States, and for himself, prays as follows and request:

A. That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B. That in the event the United States Government intervenes, Mr. Fernandez be awarded 25% of the proceeds of the action or the settlement of any such claim;

C. That in the event the United States Government does not intervene, Mr. Fernandez be awarded 30% of the proceeds of this action or the settlement of any such claim;

D. That under the Florida False Claims Act, the Court enter judgment against the Defendants for the maximum amount of damages and civil penalties available under the Florida False Claims Act; and award the maximum share permitted by law of all amounts recognized by that Act as a consequence of this action;

E. That Mr. Fernandez be awarded all costs, attorneys' fees, and litigation expenses; and

F. That the United States Government and Mr. Fernandez receive any and all other relief, both at law and in equity, to which they may reasonably appear entitled.

JURY DEMAND:  Plaintiff request trial by jury.

Respectfully submitted

/s/ Jonathan Kroner
FBN 328677
Jonathan Kroner Law Office
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
305.310.6046
jk@FloridaFalseClaim.com

/s/ James T. Ratner
P.O. Box 1035
Woodstock, NY 12498
845-750-3293
jamestratner@yahoo.com

Attorneys for *Qui Tam* Plaintiff Relator